IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, | CV 13–199–M–DLC |
| Plaintiff, | |
| vs. | ORDER *NUNC PRO TUNC* |
| PAUL BRADFORD, Kootenai National Forest Supervisor; FAYE KRUEGER, Regional Forester of Region One of the U.S. Forest Service; UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture; and U.S. FISH AND WILDLIFE SERVICE, an agency of the U.S. Department of Interior, | **FILED** JUL 2 5 2014 Clerk, U.S. District Court District Of Montana Missoula |
| Defendants. | |

Plaintiff challenges the Pilgrim Creek Timber Sale Project. Both parties move for summary judgment and for the reasons set forth below both motions are granted in part and denied in part.

### SYNOPSIS

The Pilgrim Creek Timber Sale Project ("the Project") is located on the Cabinet Ranger District of the Kootenai National Forest in Sanders County, Montana near the Cabinet-Yaak Ecosystem Grizzly Bear Recovery Zone. The Project has several design elements, including: 536 acres of intermediate timber

1

harvest, 898 acres of regeneration timber harvest, 4,564 acres of natural fuels reduction activities, or prescribed burning, 47 miles of road reconstruction, 1.1 miles of temporary road construction, and 4.7 miles of new, permanent road construction.

Plaintiff contends the Project will harm grizzly bears. Specifically, Plaintiff contends that the Project's authorization for construction of 4.7 miles of new, permanent roads is inconsistent with the Kootenai National Forest Plan and the 2011 Access Management Amendments Incidental Take Statement and the Project thus violates the National Forest Management Act ("NFMA"), the Endangered Species Act (ESA), and the National Environmental Policy Act (NEPA). Plaintiff also contends that the Forest Service violated NFMA and NEPA when it authorized the use of helicopters to conduct much of the Project's prescribed burning. Plaintiff seeks declaratory and injunctive relief.

The Court concludes that, as a general matter, properly barriered roads do not contribute toward a net permanent increase in linear miles of open roads under the Access Amendments, but that here, the new, permanent roads for the Project will not be barriered in the manner required by the Access Amendments. Accordingly, this matter is remanded to the Forest Service so that it can address this deficiency. The Court also concludes that the Forest Service's analysis of

2

helicopter use for the Project is consistent with its duties under NFMA and NEPA.

## I.    History

Some history is necessary to provide context to this dispute.  The U.S. Fish and Wildlife Service listed grizzly bears in the lower 48 states as a threatened species under the Endangered Species Act in 1975.  The population of grizzly bears between 1800 and 1975 declined from estimates of over 50,000 grizzlies to fewer than 1,000.  The grizzly bear's historic range extended from the Great Plains west to the California coast and south into Texas and Mexico.  Today, there are approximately 1,500 grizzly bears in the lower 48 states occupying certain mountainous regions, national parks, and wilderness areas in Washington, Idaho, Montana, and Wyoming.

With the grizzly bear's designation as a threatened species in 1975, the U.S. Fish and Wildlife Service was required to design and approve a recovery plan for the species.  The Fish and Wildlife Service approved the original Grizzly Bear Recovery Plan in 1982, and revised the Plan in 1993.  The 1993 Recovery Plan established six grizzly bear recovery zones: the Northern Continental Divide Ecosystem (with a current population of approximately 765 grizzly bears), the Greater Yellowstone Area (600 grizzly bears), the Cabinet-Yaak Ecosystem (42

3

grizzly bears), the Selkirk Ecosystem (30 grizzly bears), the North Cascades Ecosystem (10-20 grizzly bears), and the Bitterroot Ecosystem (0 grizzly bears). Recovery zones are defines as "areas within which the population and habitat criteria for achievement of recovery will be measured." AR 033604. As the numbers above demonstrate, only five of the six recovery zones are currently occupied by any grizzly bears, and four of the six recovery zones are occupied by less than fifty bears.

The Cabinet-Yaak Ecosystem grizzly bear recovery zone, which is adjacent to the Project area, encompasses approximately 2,609 square miles of northwestern Montana and northeastern Idaho. The federal government owns approximately 90 percent of the land within the Cabinet-Yaak Ecosystem recovery zone and the Kootenai National Forest manages 72 percent of the recovery zone.

In 1991, the Fish and Wildlife Service determined that reclassification of the grizzly bear within the Cabinet-Yaak Ecosystem from threatened to endangered was warranted but precluded by higher priority actions. This determination was reaffirmed in 1993, 1998, and 1999. In 1999, the Fish and Wildlife Service stated that the Cabinet-Yaak population was in danger of extinction due in part to habitat alteration and human intrusion into grizzly bear habitat, specifically, the cumulative impacts of recreation, timber harvest, and

other forest uses associated with road construction. The Fish and Wildlife Service currently considers the Cabinet-Yaak Ecosystem grizzly bear population to be endangered due to continuing high levels of human caused mortality, genetic and demographic isolation, inadequate habitat protections, and increasing fragmentation.

As of 2011, the Cabinet-Yaak Ecosystem was failing all three grizzly bear population recovery targets, including the recovery target for number of female grizzlies with young, the distribution of females with cubs throughout the recovery zone, and the number of human caused mortalities per year within the recovery zone. While the recovery target minimum population of grizzly bears in the Cabinet-Yaak Ecosystem is 100 bears, the current population in the recovery zone is approximately 42 bears. According to the Fish and Wildlife Service, "recent levels of human-caused mortality in the [Cabinet-Yaak Ecosystem] do not appear to be sustainable." FWS 000176.

## II. The Access Amendments

The Fish and Wildlife Service sought to address what it considered one of the primary drivers of the problems facing the grizzly bears in the Cabinet-Yaak Ecosystem, i.e., roads, in 2011 when it approved the Access Management Amendments ("Access Amendments"). The Access Amendments "amend Forest

5

plans [in the Cabinet-Yaak and Selkirk Ecosystems] to include a set of wheeled motorized access and security guidelines to meet [the Forest Service's] responsibilities under the Endangered Species Act to conserve and contribute to recovery of grizzly bears." AR 033799. The Access Amendments respond to the Fish and Wildlife Service's continuing belief that "a viable road and access management plan is the most important factor influencing the long-term impacts on grizzly bears in habitat influenced by timber harvesting." FWS 000212. According to the Fish and Wildlife Service, this is because "[r]oads probably pose the most imminent threat to grizzly habitat today [and] the management of roads is one of the most powerful tools available to balance the needs of people with the needs of bears." *Id.* The Kootenai National Forest, on which the Project area is entirely located, formally adopted the Access Amendments into its Forest Plan in November 2011.

The Access Amendments included "management direction" for roads within the designated Cabinet-Yaak Ecosystem recovery zone and for areas outside of the recovery zone that have experienced recurring use by grizzly bears. Agency biologist have designated five Bears Outside of Recovery Zone polygons ("BORZ") which encompass areas adjacent to the Cabinet-Yaak Ecosystem where grizzly bear use is recurring. The Fish and Wildlife Service has concluded that

6

these areas outside of the recovery zone "warrant[] some level of management consideration." AR 033839-33840.

One of these areas outside of the recovery zone is the Clark Fork Bears Outside of Recovery Zone polygon ("Clark Fork BORZ"). The Clark Fork BORZ covers 101,899 acres, a majority of which is administered by the Kootenai National Forest. There were 14 credible grizzly bear sightings within the Clark Fork BORZ between 1994 and 2009.

The Access Amendments provide that within each individual BORZ, such as the Clark Fork BORZ, there shall be "no permanent increases in the total linear miles of 'open roads' and 'total roads' on National Forest System lands . . . above baseline conditions," except in cases where the Forest Service lacks any discretion to prevent road building. FWS 000236. Increases in total linear miles of open and total roads are, however, allowed when they are "temporary" or "compensated for with in-kind reductions concurrently or prior to such increases." *Id.*

## III. The Project

The project area for the proposed Pilgrim Creek Timber Sale Project encompasses approximately 36,602 acres and is located entirely within the Clark Fork BORZ. According to the Forest Service and Fish and Wildlife Service, the Project is "designed to improve growing conditions, reduce stand densities,

7

increase the proportion of root disease-resistant tree species, and increase age class diversity in lodgepole pine dominated communities." FWS 000018. The agencies also assert that the project will "improve forage production and quality." *Id.*

As noted above, the Project has several design elements, including, among others: 536 acres of intermediate timber harvest, 898 acres of regeneration timber harvest, 4,564 acres of prescribed burning, or natural fuels reduction (with 3,754 acres of the prescribed burning to be conducted by helicopter ignition), 47 miles of road reconstruction, 1.1 miles of temporary road construction, and 4.7 miles of new, permanent road construction. The timber harvest activities will focus on Douglas-fir and true fir species affected by root-disease and lodgepole pine communities damaged by mountain pine beetle infestation. The prescribed burning will focus on areas where "coverage to forage ratios are currently skewed towards cover and there is a need to improve both the quality and quantity of available big game forage." AR 023598. While the Project contains no measures for concurrent, in-kind road reductions, Defendants assert that all increases in linear miles of road will be temporary.

Plaintiff challenges the Forest Service's approval of the Project and the Fish and Wildlife Service's concurrence in the Forest Service's determination that the Project is unlikely to adversely affect the grizzly bear. Plaintiff primarily contends

that the agencies' authorization for construction of 4.7 miles of new, permanent road in the Clark Fork BORZ violates the Access Amendments and its incidental take statement, is inconsistent with the Kootenai National Forest Plan, and is arbitrary and capricious. Plaintiff also contends that the agencies failed to take a hard look at and failed to apply best science with respect to the use of helicopters for prescribed burning activities authorized by the Project. Plaintiff raises other issues with the agencies' decisions that will be discussed in more detail below.

## LEGAL STANDARD

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251 (1986). Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248.

## DISCUSSION

Two of the Project's design elements are at the center of this dispute: (1) the construction of 4.7 miles of new, permanent roads; and (2) the use of helicopters

9

for conducting prescribed burns.

## I.   Roads

Plaintiff contends that the construction of 4.7 miles of new, permanent roads as authorized by the Project is inconsistent with the Access Amendments' Incidental Take Statement and constitutes a violation of section 9 of the ESA, NFMA, and NEPA. Specifically, Plaintiff contends that under the Access Amendments, new roads, even if barriered after completion of project activities, must be counted in the measure of total miles of linear roads. Thus, Plaintiff contends that linear miles of total roads will not be returned to baseline conditions upon completion of the Project as required by the Access Amendments. Plaintiff also contends that even if properly barriered roads do not count toward the measure of linear miles of total roads, the new, permanent roads will not be properly barriered.

As the parties agree, a violation of the Access Amendments' Incidental Take Statement constitutes a violation of section 9 of the ESA. Section 9 of the ESA prohibits "take" of any listed species. 16 U.S.C. § 1538(a)(1)(B). "Take" includes "harassment" of a listed species by means of "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavior patterns." 16 U.S.C. §

10

1532(19); 50 C.F.R. § 17.3. If an agency action is likely to cause take but not jeopardize the species, the Fish and Wildlife Service may issue an incidental take statement, which establishes the expected impact to the species, reasonable and prudent measures necessary to minimize take, and terms and conditions for implementing those measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. 401.12(i). If an agency complies with the terms and conditions of an incidental take statement, it is exempt from ESA section 9 liability. 50 C.F.R. 402.14(i)(5). In this case, if the Project is in compliance with the Access Amendments and its incidental take statement, then Defendants are exempt from any ESA section 9 liability that Plaintiff has asserted.

Also, as the parties agree, to comply with NFMA the Project must be consistent with the Access Amendments because the Access Amendments are incorporated into the Kootenai National Forest Plan. NFMA requires that each National Forest develop a Land and Resource Management Plan or "forest plan." 16 U.S.C. § 1604(d). A forest plan is implemented through site-specific actions. *Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1376 (9th Cir. 1998). Under NFMA, site-specific projects must be consistent with the forest plan. *Id.;* 16 U.S.C. § 1604(i). "Agencies are entitled to deference to their interpretation of their own regulations, including Forest Plans." *Native*

11

*Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 960 (9th Cir. 2005). However, an agency interpretation is not entitled to deference when "it is contrary to the clear language of a Forest Plan." *Id.* at 962. Here, the Project must be consistent with the Access Amendments in order to be consistent with the Kootenai National Forest Plan.

Plaintiff also asserts that the Forest Service has violated NEPA by relying on incorrect assumptions or data in the Environmental Impact Statement ("EIS") associated with the Project. NEPA prohibits uninformed agency action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). An EIS must take a "hard look" at a proposed project's environmental effects. *Native Ecosystems*, 418 F.3d at 960. A district court "must make a pragmatic judgment" whether an EIS fosters informed decision-making and informed public participation and whether the EIS contains "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982).

## A. Whether "barriered roads" count toward the measure of total linear miles of road under the Access Amendments

The Access Amendments provide "management direction" regarding roads within Bear Outside of Recovery Zone polygons, such as the Clark Fork BORZ.

The parties agree that Standard II(B) is the applicable standard relevant to road management on the Clark Fork BORZ.

Standard II(B) states that "[t]he Forest shall ensure no net permanent increases in linear miles of total roads in any individual BORZ area above the baseline conditions" except in certain circumstances where the agency lacks discretion to prevent road building. FWS 000157. The term "total roads" is footnoted, clarifying that "total roads" "[i]ncludes roads that do not have restrictions on motorized use and roads that are closed to public motorized use." *Id.* Standard II(B) further provides that "potential increases in linear miles of total roads must be compensated for with in-kind reductions in linear total road miles concurrently with, or prior to, new road construction." *Id.*

Notwithstanding this blanket prohibition on net permanent increases in linear miles of total roads, Standard II(B) allows for temporary increases in linear miles of total roads when certain conditions are met. First, "newly constructed roads" must be "effectively gated and . . . restricted with a CFR closure clarifying they are not open for public use" during project activities. *Id.* Second, upon completion of activities requiring use of the road,"[t]hese roads shall be closed immediately . . . . Roads must be closed with a berm, guardrail or other measure that effectively prevents motorized access, and put in a condition such that a need

13

for motorized access for maintenance is not anticipated for at least 10 years." *Id.*
Third, linear miles of total roads must be returned to baseline conditions upon
completion of the land management project.

Plaintiff contends that the Project fails to comply with Standard II(B) of the
Access Amendments because, according to Plaintiff, the 4.7 miles of new,
permanent roads must be counted in the calculation of linear miles of total roads
despite these roads being gated and restricted during project activities and then
barriered with a permanent barrier following completion of project activities. In
Plaintiff's view, "[j]ust because these new roads are closed to motorized use does
not exclude them from the calculation of Total Linear Road Mileage." (Doc. 30 at
6.) Plaintiff concedes that if "barriered roads are excluded from the Total Linear
Road Mileage calculation, then there would be no net increase in Total Linear
Road Mileage at the end of the Project, and the Project would comply with the
Access Amendment Incidental Take Statement standards." *Id.* at 3. Defendants
contend that barriered roads do not contribute to the measure of linear miles of
total roads and therefore there will be no net permanent increase in linear miles of
total roads.

The Court concludes that newly built roads that are gated during project
activities and then closed immediately upon completion of project activities such

14

that they qualify as "barriered roads" do not contribute to the measure of linear miles of total roads. "Total roads," as used in the Access Amendments "include roads that do not have restrictions on motorized use and roads that are closed to public motorized use." FWS 000157. Thus, the term "total roads" does not expressly include "barriered roads," which are closed to *both* public and administrative use.

Standard II(B)(2) requires that following completion of project activities, the new roads shall be "closed with a berm, guardrail or other measure that effectively prevents motorized access." *Id.* Similarly, "barriered roads" are defined as "roads that have been restricted with a physical barrier such as a rock barrier, or dirt berm/ditch in order to prohibit all motorized use." AR 034284. Moreover, unlike "restricted roads," which are merely gated and allow administrative motorized use, "barriered roads" are "managed with the long term intent for no motorized use, and [are] treated in such a manner so as to no longer function as a road." AR 034151. Similarly, Standard II(B)(2) requires that any new roads be closed "and put in a condition such that a need for motorized access for maintenance is not anticipated for at least 10 years." FWS 000157. In sum, Standard II(B)(2)'s requirements for closing new roads following project activities directly parallels the definition of "barriered roads." Notably, "barriered roads,"

15

by definition, "contribute[] to optimal secure Core Area for grizzly bears." AR 034284.

Defendants correctly interpret Standard II(B) to exclude from the measure of linear miles of total roads those roads that are "barriered" following completion of project activities. Thus, if the 4.7 miles of new, permanent roads are appropriately barriered and put in a condition such that a need for motorized access for maintenance is not anticipated for at least 10 years the roads do not result in a net permanent increase in linear miles of total roads. Accordingly, Defendants are granted summary judgment as to this issue.

### B. Whether the new roads for the Project will be barriered in the manner required by the Access Amendments

Though the Court concludes that properly barriered roads do not count toward the measure of linear miles of total roads, here, another issue remains to be decided: whether the Forest Service will in fact be closing these roads in the fashion required by Standard II(B). Though certain portions of the administrative record indicate that the new roads will be barriered with a permanent closure device as required, *see* FS 024231, other portions of the record suggest that the roads will merely be gated to "allow for motorized access sometime in the future." AR 024315.

Standard II(B)(2) requires that new roads be "closed with a berm, guardrail or other measure that effectively prevents motorized access, and put in a condition such that a need for motorized access for maintenance is not anticipated for at least 10 years." FWS 000157. Standard II(B)(2) thus requires a closure distinct from a closure associated with "restricted roads." Indeed, Defendants do not dispute that "restricted roads," which are "generally gated" and open for "low intensity" administrative use, increase the measure of total roads. FS 34284. Standard II(B) makes clear that it is insufficient to "close" a road with an eye towards future motorized access within ten years of the closure.

The following quotation from the Forest Service's Record of Decision for approval of the Project indicates that, despite contrary indications elsewhere in the record, upon completion of Project activities the new roads will not be appropriately closed with a permanent closure device as required by Standard II(B):

> Access to new construction and closed roads proposed for use would be controlled post treatment by gates or other closure devices. These closure devices allow for motorized access sometime in the future, which may help fire suppression and stand-tending operations such as pre-commerical thinning (DEIS 3-39). Closed roads would require minimal maintenance due to the infrequency of use.

17

FS 024315. The above quoted passage clearly indicates that the new roads will be obstructed, not with a permanent closure device such as an earth berm or ditch, as required by Standard II(B), but with a gate or other device in order to allow maintenance, future motorized access, and other administrative uses. Standard II(B) does not allow this. A gate is different in kind from an earth berm or guardrail. Furthermore, leaving the road in a condition where its future use and maintenance is contemplated and anticipated is inconsistent with Standard II(B)'s requirements. The Forest Service's interpretation, by which these new roads may be merely gated in order to allow various future motorized access, is contrary to the plain language of the Access Amendments and is not entitled to deference. *Native Ecosystems*, 418 F.3d at 962. Indeed, such an interpretation is contrary to Defendants' legal position in this litigation.

The Forest Service may choose to gate these new roads in order to allow future motorized access, maintenance, and other administrative uses, but if it chooses this course, it must, pursuant to Standard II(B), make in-kind reductions in linear total road miles concurrently with, or prior to, the new road construction. If, on the other hand, the Forest Service does not wish to make in-kind reductions, it must "barrier" the new roads consistent with all of the requirements of Standard II(B)(2). Because the Project authorizes the Forest Service to "close" the new

roads in a manner that is inconsistent with the Access Amendments Incidental

Take Statement and the Forest Plan, the agencies' decision is not in accordance

with NFMA, the ESA, and NEPA. Accordingly, the Court remands this issue to

the Forest Service so that it can address this deficiency. The Forest Service must

decide how it will proceed with respect to either appropriately closing the new

roads following completion of Project activities or establishing in-kind reductions

in total road miles in the Clark Fork BORZ.

## C. Various other issues raised related to roads

Plaintiff contends that the agencies' failure to consistently disclose the

number of existing miles of total road mileage in the Clark Fork BORZ constitutes

a violation of NEPA. Plaintiff contends that the inconsistencies impeded informed

decision making and show that the agencies failed to provide a full and fair

analysis of the environmental effects of the new road construction.

It is undisputed that Plaintiff failed to raise any issue with respect to the

inconsistencies regarding total road mileage during the administrative review

process. Accordingly, Plaintiff waived the right to assert a NEPA violation on

this basis. *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991).

Defendants are granted summary judgment as to this issue.

The Court also concludes that the Project does not violate the ESA due to

19

the errors in the Biological Assessment, which the agencies caught and corrected,

regarding the acreage of reduced habitat quality due to point source disturbances

and road use.[1]  First, the record indicates that notwithstanding the erroneous

numbers listed in certain tables, "the actual effects of the selected action were

analyzed and discussed in the [draft] EIS and the effects and disturbance and total

road density did not differ enough between alternatives to warrant a different

determination." FS 042969. While Plaintiff suggests this statement and the

concurring statement by the Fish and Wildlife Service must be viewed with

suspicion, the opposite is true. The Court defers to the agencies' technical

expertise with respect to questions involving scientific matters. *United States v.*

*Alpine Land & Reservoir Co.*, 887 F.2d 207, 213 (9th Cir.1989). Furthermore, it

is apparent from a full reading of the Biological Assessment and draft EIS that,

just as the Forest Service stated in its errata, the actual effects were in fact

analyzed notwithstanding the apparent typographical error in the Biological

Assessment. The errors in the Biological Assessment that were caught before the

final decision was made and which were then explained in an errata do not

demonstrate that the agencies' determination that the Project is not likely to

---

[1]  While the Court remands to the Forest Service the issue of the Project's road impacts
for the reasons detailed in Part B above, the Court nevertheless provides here its decision with
respect to errors in the Biological Assessment.

adversely affect grizzly bears is arbitrary and capricious in violation of the ESA. Defendants are entitled to summary judgment on this issue.

## II.    Helicopters

Plaintiff contends that the Forest Service's analysis of the effects of helicopter use for prescribed burning activities is flawed because it failed to apply best available science as required by NFMA regulations, 36 C.F.R. § 219.3, § 219.35(a). Plaintiff further contends that the Forest Service's analysis regarding helicopter use is incomplete and thus in violation of NEPA.

As noted above, the Project calls for prescribed burning for natural fuels reduction, with 3,754 acres of the prescribed burning to be conducted by helicopter ignition. These prescribed burning activities will be conducted in various predetermined locations scattered throughout the Project area of 29,987 acres over the course of approximately 10 years. The Forest Service determined that the helicopter usage may affect but is not likely to adversely affect the grizzly bear because (1) there will be few trips and no more than two activities per year (2) there will be no more than two days of activities per analysis area per bear year; (3) there will be no landings within the project area; (4) the duration of the each helicopter activity is short; and (5) there will be no lingering effects. The Forest Service explained that the prescribed burns "would vary from low to

21

moderate severity, leaving a mosaic of burned and unburned areas." AR 024252.
The Forest Service recognized that "a grizzly bear in the area may be disturbed by
burn activities" "for a brief period," but that "it is expected that bears and other
wildlife would return to these areas relatively quickly" to enjoy the resulting
"flush of young, palatable vegetation." *Id.*

## A.  NFMA claim

Plaintiff contends the Forest Service's analysis is contrary to the joint
agency 2009 "Guide to Effect Analysis of Helicopter Use in Grizzly Bear Habitat"
("Guide").  The Guide states that "[i]f the duration of helicopter use is short and
the effects are relaxed almost immediately . . ., then low altitude helicopter
operations are *generally* 'not likely to adversely affect' grizzly bears."  FWS
000373 (emphasis in original).  The Guide specifies that "[h]elicopter use
involving short duration (e.g. one day) and low frequency (e.g. several trips) may
affect grizzly bears, but because the disturbance is relatively minor in intensity and
does not persist for long periods (or through a season), the consequences should
be *insignificant*." *Id.*(emphasis in original).  Helicopter operations that are
generally unlikely to adversely affect grizzly bears include all of the following
features: "(1) low altitude (less than 500 m); (2) with or without landings; (3) in
proximity to grizzly bears or their habitat; (4) the effects are relaxed almost

immediately; and (5) the duration is short (activity usually concludes within a 48-hour period)." FWS 000374. The Guide specifically lists "limited prescribed burning" as an activity which is generally not likely to adversely affect grizzly bears. *Id.*

By contrast, "extended prescribed burning" is listed in the Guide as an activity which is generally likely to adversely affect grizzly bears. Such operations are characterized by "low altitude helicopter use [that] is extended (occurs over a 48-hour period), and the effects are not relaxed (multiple trips, passes, or sweeps each day)." FWS 000374.

These general guidelines notwithstanding, the Guide recognizes that "[t]he effects of helicopter operations on grizzly bears will depend on a number of variables, plus considerations of any extenuating circumstances. It is inappropriate to believe there is a 'cook book' or 'one size fits all' answer." FWS 000370.

Contrary to Plaintiff's assertion, the Final EIS demonstrates that the Forest Service based its determination on and applied the best available science as set forth in the Guide. The Forest Service's determination that the helicopter operations are not likely to adversely affect the grizzly bear are clearly based on the multiple variables and factors listed in the Guide. The determination is based

specifically on the low frequency of trips per year, the low duration of activities

per analysis area, the absence of landings in the project area, and the absence of

lingering effects. The Final EIS demonstrates that the Forest Service also

considered the location of the activity (i.e. the Clark Fork BORZ), the distribution

of the activities throughout the Project area, the intensity of the disturbance, the

effect of the operations on forage and bear habitat, the time of year of the

operations, and potential cumulative impacts associated with the helicopter

operations. Plaintiff thus fails to demonstrate that the Forest Service failed to

apply best available science in violation of NFMA. Defendants are entitled to

summary judgment on this claim.

## B.    NEPA claim

Plaintiff contends, in similar fashion, that the Forest Service failed to take a

hard look at the impacts of helicopter use on grizzly bears. In particular, Plaintiff

contends that the Forest Service failed to analyze helicopter use in terms of

frequency, duration, and altitude.

The Final EIS specifically discusses (1) the number of trips per year, (2) the

number of days per activity per analysis area per bear year; (3) the duration of

these trips; and (4) the fact that there will be no landings. Plaintiff recognizes that

the Final EIS discusses these factors, but contends that the analysis is too cursory

to pass muster under NEPA.

The Court concludes that the EIS contains "a reasonably thorough discussion of the significant aspects of the probable environmental consequences" associated with helicopter use for prescribed burning activites. *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). Plaintiff contends that the analysis lacks discussion of the altitude of the helicopter usage. It is clear, however, that the Forest Service recognized that helicopter ignition for prescribed burning occurs at low elevations. Indeed, the fact seems so obvious as to not need mention. Notably, high altitude helicopter use has "no effect" on grizzly bears. FWS 000373.

More problematic, perhaps, is the Forest Service's limited analysis regarding duration of helicopter activities. The Guide states that helicopter activities of "short duration" "usually conclude[] within a 48-hour period," FWS 000374, whereas the Forest Service concluded that the duration of the Project's helicopter activities is "short," despite the fact that the Project authorizes helicopter activities lasting up to 48 hours, AR 024253. Though the Forest Service's analysis with respect to duration of helicopter activities is not extended, and falls within a gray area relative to the Guide, the Court concludes that this is not fatal to the Forest Service's ultimate determination and does not demonstrate a

25

violation of NEPA. The Guide recognizes that "effects of helicopter operations on grizzly bears will depend on a number of variables," and the EIS contains a discussion of numerous of these important variables associated with the Project's helicopter activities. FWS 000370. The Court therefore concludes that the Forest Service conducted an analysis adequate to pass muster under NEPA. Defendants are entitled to summary judgment as to this issue.

### III.  Plaintiff's motion to supplement

One day after the deadline for such a motion, Plaintiff moved the Court to supplement the administrative record with a document it refers to as "the full Kootenai National Forest Plan," which is in fact an unapproved draft of a new Kootenai National Forest Plan which was released on September 23, 2013. (Doc. 12 at 2.) This document post-dates the Project decision and thus is properly excluded from the administrative record. *Vt. Yankee Nuclear Power Corp.v. NRDC*, 435 U.S. 519, 555 (1978). Plaintiff asserts that the document is "relevant" to the Court's decision, but Plaintiff did not reference this document in any way in its summary judgment briefing. (Doc. 13 at 4.) Therefore, the Court did not rely on the document, and indeed it was never filed in the docket. For these reasons, Plaintiff's motion to supplement is denied.

IT IS ORDERED that the motions for summary judgment (Docs. 16, 21) are

GRANTED IN PART and DENIED IN PART as detailed above. This matter is remanded to the Forest Service for further proceedings consistent with this order and the law.[*]

IT IS FURTHER ORDERED that the defendants are enjoined from implementing the Project while the proceedings required on remand are pending.

IT IS FURTHER ORDERED that Plaintiff's motion to supplement is DENIED.

IT IS FURTHER ORDERED that Plaintiff's motion for preliminary injunction is DENIED as moot.

The Court firmly believes that the amount of attorney's fees, if any, owed to Plaintiff in connection with this action is most appropriately resolved by the parties without the Court's intervention. An amicable and independent resolution of this issue will not only conserve scarce judicial resources, but will save the parties and their counsel the time and expense associated with formal proceedings before the Court. Accordingly,

IT IS FURTHER ORDERED that counsel for Plaintiff and Defendant shall meet within 15 days of the date of this order, either in person or telephonically, for the purpose of determining Plaintiff's attorney's fees, if any. The parties shall have

---

[*] The Court's original Order (Doc. 40) mistakenly provided: "This matter is remanded to the Forest Service so that it may prepare a supplemental EIS that is consistent with this order and the law." This was a clerical error.

until 30 days from the date of this order to negotiate and agree upon a fee amount. The parties shall file a joint notice by that date stating whether they have resolved the issue, or whether the Court must determine the appropriate award of fees and expenses. Should the parties notify the Court that they are unable to resolve this matter, the Court will issue a scheduling order for briefing that will supplant the standard schedule set forth in Rule 54(d)(2) of the Federal Rules of Civil Procedure.

IT IS FURTHER ORDERED that the Clerk of Court is directed to enter judgment in favor of Plaintiff and Defendants and close this case.

DATED this __25th__ day of June 2014.

Dana L. Christensen, Chief Judge
United States District Court